David Paul Biesemeyer
7650 E. Jim Cottrell
Palmer, AK 99645
907 982 2328
davebiesemeyer@hotmail.com
Pro Se



RECEIVED
MAY 09 2024
CLERK, U.S. DISTRICT COURT
ANCHORAGE, AK

IN THE UNITED STATE DISTRICT COURT FOR THE DISTRICT OF ALASKA
ANCHORAGE DIVISION

DAVID PAUL BIESEMEYER

        Plaintiff

v.

THE MUNICIPALITY OF
ANCHORAGE, ALASKA

        Defendant

Case No. 3:23-CV-185 SLG KFR

JURY TRIAL DEMANDED

**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES UNDER EIGHTH
AMENDMENT OF THE UNITED STATES CONSTITUTION**

COMES NOW the Plaintiff, David Paul Biesemeyer, and files this First Amended

Complaint against Defendant Municipality of Anchorage ("Defendant" "Municipality" or

"Anchorage"):

**INTRODUCTION**

1

In dismissing the Plaintiff's original Complaint without prejudice and with leave to amend,

the Court determined that the Plaintiff had alleged facts sufficient to permit a reasonable

inference that the tax foreclosure and subsequent sale of his property were not purely remedial

and were disproportionate in relation to what he did to trigger these events.

The Court went on to instruct that if the Plaintiff successfully cured the statute of limitations issue associated with this Eighth Amendment claim, he will have stated a cognizable claim for violation of the Excessive Fines Clause.

3

Equitable tolling is a principle that allows courts to extend the statute of limitations on a case-by-case basis, to prevent unfairness. It can apply when the plaintiff is prevented from filing due to extraordinary circumstances beyond their control or when the defendant has actively conducted misleading or fraudulent behavior.

4

The instant case described by the Amended Complaint involves several factors that suggest the possibility of applying equitable tolling: Plaintiff experienced severe continuing health challenges leading to incapacity, recovery and homelessness, being mislead by an attorney who was retained before Plaintiff's injury where that attorney took no steps to protect Plaintiff's interest, and the conduct by the Municipality.

5

In this First Amended Complaint, and its attached exhibits along with the assertions and arguments supported therein, the Plaintiff lays out the facts giving rise to his claim and the facts which would authorize equitable tolling as well as equitable estoppel; It shall be up to the Court's sound discretion as to whether Plaintiff has successfully cured the statute of limitations issue with this Amended pleading.

6

Furthermore the Plaintiff directly incorporates the arguments and assertions contained in the Summary of Exhibits to Plaintiff's First Amended Complaint as if set out verbatim here to the extent that it, inter alia, provides evidence sufficient to support a finding of that the Plaintiff is entitled to equitable tolling or that the Municipality is equitably estopped from claiming the

limitations defense.

## SUMMARY OF ACTION

### 7

This is an action for declaratory and injunctive relief and for actual and compensatory damages brought pursuant to the Eighth Amendment to the United States Constitution as a result of the confiscation and sale of Plaintiff's real property to satisfy debts allegedly owed to the government that operates as the Municipality of Anchorage.

### 8

The Plaintiff here alleges federal question causes of action given cognizance under *Tyler v. Hennepin County*, No. 22-166, __ S. Ct. __, 2023 WL 3632754 (May 25, 2023):

### 9

Specifically, the forfeiture of the property, which is worth far more than the amount needed to satisfy the alleged tax debt plus interest, penalties, and costs, is an excessive fine, within the meaning of the Eighth Amendment as applied to the States through the 14th Amendment.

## CONSIDERATIONS GOING FORWARD

### 10

To appropriately consider the actionability of the claims stated, it is essential for interested parties to understand, and the Plaintiff to acknowledge, that this matter may be resolved through the application of one of two pivotal legal principles: *"The law will not protect a man insistent in his folly,"* on the one hand, or *"The law will not shield the government that persists in its injustice,"* on the other.

### 11

Each principle provides a unique interpretive framework that will shape the resolution of

the current legal issue.

12

Although it's quite uncommon for these ideals to clash, it's certainly within the realm of possibility, and hence should not be entirely unforeseen.

13

The principle embodied in each maxim brings a unique perspective to the table, and their potential conflict embodies the dynamic intersection of personal responsibility and governmental accountability within the legal framework.

14

To that end, it is more important to give effect to the maxim *"The law will not shield the government that persists in its injustice."* than the maxim *"The law will not protect a man insistent in his folly."* when a fact pattern supports both.

15

While both maxims represent key aspects of societal fairness and justice, in a scenario where the fact pattern supports both, the maxim *"The law will not shield the government that persists in its injustice"* should be prioritized because of several reasons:

## Pervasiveness of the Impact

16

Government actions have a far-reaching impact affecting a larger group of people and, sometimes, the entirety of the nation, compared to actions by an individual. Injustice committed by the government can jeopardize the fundamental rights and freedoms of the citizens, affecting

societal structures at a much larger scale. This inherent imbalance makes the maxim against government injustice crucial to uphold justice and maintain societal balance.

## Democratic Accountability

17

Giving effect to the maxim against government injustice strengthens democratic institutions by holding those in power accountable. It re-enforces the principle that governments are not above the law, and they are answerable to the same legal and moral codes they enforce upon other members of society. This accountability is integral to functioning democracies where governments are elected by the people and are responsible for their welfare.

## Trust in Law and Order

18

The prevalence of justice in a society is often measured by the extent of fairness characterizing its government's actions. When the government acts unjustly and is shielded by the law, public trust in institutions and the rule of law erodes. Upholding the maxim that law will not protect a government committing injustice strengthens public trust in law and order, promoting social coherence and tranquility.

## Prevention of Abuse of Power

19

History is replete with instances where uncurbed governmental power has led to systemic abuse, oppression, and injustice. Prioritizing the maxim that law will not shield the government persisting in injustice helps curb unbound authority, preventing potential abuses of

power. It reaffirms a key democratic principle – the rule of law must prevail over the rule by law.

## Scope for Rectification

### 20

While the maxim "*The law will not protect a man insistent in his folly,*" is important in ensuring personal responsibility and accountability, an individual's scope for rectifying any wrongdoing is generally limited to changes in personal behavior. In contrast, when a government is held responsible for persisting injustice, the scope for rectification is systemic, leading to the potential of broader, possibly undesirable, societal change.

### 21

In sum, when a fact pattern supports both maxims, priority should be given to *"The law will not shield the government that persists in its injustice."* This approach maintains balance within society, secures democratic governance, promotes faith in institutions, prevents abuses of power, and ensures overall societal progress.

## PARTIES

### 22

Plaintiff submits to the jurisdiction of this Court, and may be contacted by mail at the following address: 7650 E. Jim Cottrell Palmer, AK 99645. He proceeds herein Pro Se.

### 23

The Municipality of Anchorage is a municipal corporation organized and existing under the laws of the State of Alaska.  Pursuant to AK Stat § 29.35.010(14) (2022), it has the capacity to sue and be sued. As an entity, it resides in the Anchorage Division of the United States District Court for the District of Alaska.

Pursuant to AK Stat § 29.20.370 (2022) the Anchorage Municipal attorney represents the municipality as attorney in civil and criminal proceedings; therefore, the Municipal Attorney for Anchorage may accept service of summons and process on behalf of the municipality. As such, the Municipality of Anchorage may be served by serving process upon the Municipal Attorney or his authorized agents at 632 W 6th Ave Suite 730 Anchorage, AK 99501.

25

The Municipality may also be served by mail by sending a copy of any requests for waiver of service and summons to the Municipality of Anchorage, Legal Department PO Box 196650 Anchorage, AK 99519.

## JURISDICTION AND VENUE

26

Plaintiff brings this action pursuant to the Eighth Amendment to the United States Constitution. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

27

The unconstitutional taking of Plaintiff's property was committed within the Anchorage Division of the District of Alaska. Venue is proper in this Court under 28 U.S.C. § 1391(b) as every act of which Plaintiff complains occurred in the Anchorage Division of the United States District Court for the District of Alaska.

## ANTE LITEM REQUIREMENTS

28

To the best of Plaintiff's knowledge, information and belief, there are no administrative conditions precedent for purposes of bringing this action.

## LIMITATIONS OF ACTION

### 29

Had this action been brought against a private party on the same or similar facts, it would have been brought within the appropriate statute of limitations, 10 years, per either AK Stat § 09.10.230 (2022), dealing with claims regarding real estate,  or AK Stat § 09.10.100 (2022), in that it would be an action for a cause not otherwise provided.  However, because it is a cause of action against a local government that is only cognizable through 42 USC § 1983, the statute of limitations that would otherwise run for 10 years is reduced to a mere 2 years, which would seem to place the instant matter outside of the normal limitations period, absent a basis for equitable tolling or the existence of reasons to equitably estop the Defendant from availing itself of the normal limitations period

### 30

To the extent that there does not exist sufficient reason for the Court to equitably estop the Defendant from relying on the limitations period, any period of limitations that may otherwise apply can be equitably tolled for such periods as are necessary to allow this action to continue.

### 31

A litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way.

### 32

"[T]there is no magic period of time — no per se rule — for equitable tolling premised on ineffective assistance of counsel." *Wang v. BIA*, 508 F.3d 710, 715 (2d Cir.2007). Though there are arguments that advocate for "some outer limit on equitable tolling", precedent establishes the contrary — the length of time does not control the equitable tolling jurisprudence.

In *Mejia-Hernandez*, the court held that a petitioner who waited for nearly seven years was entitled to equitable tolling of the entire period, because waiting was reasonable under the circumstances. *See Mejia-Hernandez*, 633 F.3d at 825 (recognizing that petitioner's wait was "long, but ultimately reasonable")[.]

34

The Plaintiff therefore submits the following facts in support of his argument that he is entitled to the benefit of equitable tolling:

35

The Plaintiff, a resident of Anchorage, Alaska, purchased a property in cash in the year 1987. Over the years, he acquired a penchant for buying and selling old houses. Most notably, he lovingly restored an aged property located on Hawkins Lane, a project that was born not out of luxury but necessity.

36

Regrettably, the building, which was in a state of severe disrepair, might have been a sounder candidate for demolition. However, staying true to his resourcefulness, the Plaintiff renovated the house transforming it into a charming abode. Despite it being easier to build anew, the value he added to the house was remarkable.

37

Starting from the 2000s, the Municipality of Anchorage began a yearly increment in the property taxes, an act that deeply offended the Plaintiff. The yearly taxes skyrocketed from aprox. $1,200 to an astounding $9,000 per year ($27,000 for 3 years). During this period, although the Plaintiff owned a few rental properties, the rental income could not keep up with the escalating tax imposition.

38

Distressed by the situation, the Plaintiff, lacking comprehensive legal knowledge,

undertook a personal endeavor to challenge the Municipality's right to tax his property. Although he realized in retrospect that he misunderstood the concept of allodial title and its application, his queries were born from a fundamental misunderstanding of the intertwining legal and commercial aspects of property ownership.

39

In an unfortunate chain of events, upon discontinuing the tax payments, the Plaintiff's property on Hawkins Lane ended up on the foreclosure list. It was supported by an uncontested affidavit, presented by the Municipality, asserting that the property was rightfully on the tax rolls.

40

Predicated on a misunderstanding, the Plaintiff misjudged the need for a competent counter-affidavit, presuming his oral arguments regarding allodial title at the forthcoming hearing would suffice. In preparation for the hearing, he also filed two motions—one to sever his property from the general foreclosure list, and another to "seal the record".

41

In retrospect, the proper action would have been for preliminary injunction and a request for Declaratory judgment on the issue. There are times when a Court would look past the Misnomer of the Caption and take a hearing on the substance of the pleading. Here, though, the Court chose to shut down the inquiry for reasons most certainly argued by the Municipality in its response to the Plaintiff's motions.

42

However, despite the Plaintiff's good faith belief in his motions and complaints, the Court denied both motions and declined to consider his arguments regarding the allodial title issue. Consequently, the property was deemed fit for a tax sale.

43

A judgment of foreclosure was made on the house, which the Municipality valued at over $500,000, initially initiated for approximately $7,700 in unpaid property tax; it would be sold for

approximately $250,000; the Municipality would keep all of the proceeds in contravention to Alaska law and in violation of Plaintiff's constitutional rights.

44

Unsurprisingly, the Plaintiff perceived the Court's decision as biased, considering it disregarded his sincere arguments. However, he found a beacon of hope in Alaska's "one-year right of redemption" clause for tax-foreclosed properties.

45

During the taxing period, the Plaintiff sought legal recourse from a self-proclaimed legal expert in Hawaii who seemed knowledgeable in the law. Guided by this individual, the Plaintiff's genuine concerns evolved a belief that all actions were governed by the UCC, and that the procedure could be overturned by the execution of various legal documents.

46

This interpretation led to his eventual dismay when he learned that the law was vastly different from his acquired understanding.

47

Under this individual's tutelage, the Plaintiff submitted a document prepared by said individual to the Municipality, believing it to be a $50,000 bond executed to discharge the property taxes. The Plaintiff remains under the impression that the document holds such a capacity, with him as the maker and the US Treasury as the Drawee.

48

The Plaintiff also submitted additional documents to the Municipality, which according to the aforesaid individual, would compel the Municipality to discharge the tax debt per the terms of the supposed bond or face monetary consequences amounting to $10,000,000 plus fees.

49

Despite the Plaintiff's sincere efforts, both the Municipality and the Court overlooked these submissions, and the foreclosure proceedings continued.

50

Despite the ineffective nature of his tactics, the individual remained undeterred and encouraged the Plaintiff to allow him, using his knowledge of the law, to move the case to federal court.

51

In the midst of these challenges, the Plaintiff was met with a severe accident that resulted in him being clinically dead on multiple occasions.

52

Each time, doctors were able to resuscitate him, after which he spent a significant period in a coma.

53

This tragic incident was documented by various news outlets and can be seen by searching "David, Tree, Maui" in Google. As of the time of a news broadcast on May 19, 2014, two weeks after the accident, the Plaintiff's prognosis was uncertain, with no expectations of recovery.

54

After regaining consciousness, the Plaintiff attempted to reconnect with his legal mentor, to no avail. Considering the lack of progress up to this point, the Plaintiff doubted his mentor's competence in shifting the case to federal court.

55

Post recovery, the mentor communicated with the Plaintiff indirectly through his brother, still neglecting to return the Plaintiff's calls. This was the final straw that prompted the Plaintiff to set boundaries.

56

As the actual date of foreclosure neared, the Plaintiff, having recovered from his clinical-death experience, returned to Alaska with the intention of paying the taxes due to avert

foreclosure.

57

Moreover, he planned to renew his challenge against the Municipality of Anchorage's jurisdiction over his property in the coming years. The Plaintiff managed to settle the tax on his rental properties, but held off on clearing the Hawkins Lane assessment until the last possible moment.

58

The Plaintiff's resolve to properly challenge the Municipality on the issue of how his property got within their municipality was galvanized when a friend from Alaska advised him to seek the counsel of an experienced attorney based in California: Dan Kirkham.

59

Initial research indicated that Kirkham had supposedly managed cases similar to the Plaintiff's situation to successful conclusion.  As such, Kirkham seemed to be a promising choice.

60

Upon consultation, Dan Kirkham, an impressive figure with both legal and medical qualifications, garnered the Plaintiff's trust. Consequently, the Plaintiff decided to retain him to assist in challenging the tax foreclosure proceedings in Anchorage.

61

During their discussion, the Plaintiff mentioned his plans of paying the current taxes and devising a new strategy to challenge the Municipality's alleged overreach. Notably, Kirkham advised the Plaintiff to refrain from paying the taxes and instead instructed him to "bring the money to us".

62

Upon initial consultations, Plaintiff was informed that Kirkham was collaborating with a man named Billy Everson; the 'us' previously mentioned referred to Everson and Kirkham

collectively. Plaintiff was assured of their competency, having been told of Everson's success with similar legal issues.

63

Kirkham boasted a streak of victories, claiming that on five different occasions, they had taken comparable cases to Federal court and prevailed each time. This track record presented a beacon of hope to the Plaintiff.

64

The Plaintiff, diligent in his self-study of law and guidance of his mentor, held a firm belief that the traditional courts of law and equity had been displaced by administrative courts governed by the use of commercial paper. This belief was reinforced by Kirkham during their introductory conversation, cementing the Plaintiff's trust in the seasoned attorney's legitimacy.

65

The Plaintiff decided to make the journey to California,and arranged a meeting with the two men. The venue for this pivotal engagement was a hotel, which Kirkham and Everson used in place of a conventional office.

66

During this encounter, Plaintiff was presented with a fee structure: an initial cost of about $30,000 followed by the option of payments should the expenses exceed the upfront quote. Kirkham, an established medical doctor since 1959 and a lawyer since 1974, often reminded the Plaintiff of his intelligence.

67

As the professional relationship progressed, Kirkham frequently deterred inquiries for updates, especially as significant deadlines approached, suggesting that "I am a Doctor and you need emergency surgery and I do not have time to explain it to you."

68

In retrospect, the Plaintiff feels he may have possessed a deeper understanding of

commercial paper than Kirkham himself, yet it was the resonance between his own knowledge of negotiable instruments and what he heard from Kirkham and Everson that led him to trust the (licenced) attorney.

69

The Plaintiff held the rationale that if his mentor in Hawaii had a grasp on federal removals, then certainly an experienced Lawyer Doctor like Kirkham would be even more adept. Kirkham's representation of himself and his past successes painted a picture of reliability in the Plaintiff's eyes.

70

Nevertheless, what emerged was a deceptively alluring trap. Kirkham and Everson's assurances transpired to be nothing more than a calculated scam, cunning in its execution and exorbitant in its cost to the Plaintiff.

71

This duo's approach differed from the Hawaiian Mentor's—instead of using a bond, they manipulated the Municipality's issued coupons. Plaintiff was persuaded into believing that accepting these coupons for value and then returning them to the Municipality was a more effective method under the Uniform Commercial Code (UCC), as it would prevent allegations of tendering fraudulent instruments since the coupons were issued by the Municipality itself.

72

In the execution of their plan, Kirkham and Everson commandeered Plaintiff's signature stamp and began performing "bankers acceptances" on the bills, subsequently sending the coupons back to the Municipality for debt discharge as per the UCC.

73

Despite the confidence with which this strategy was sold to the Plaintiff, it appeared ineffective. The persistence of the property on the foreclosure list prompted the Plaintiff to reach out to the Attorney/Doctor duo for clarification and assurance. However, the response was

dismissively familiar; they were supposedly handling it, with no time for explanations due to ostensibly more pressing medical duties.

74

Plaintiff was led into a costly scheme by Kirkham and Everson, which charged $500 for each step of their "ACCEPTANCE" process involving a series of three responses: An ACCEPTANCE, a NOTICE of DISHONOR, and a CERTIFICATE OF DISHONOR facilitated by a NOTARY. Consequently, for every letter the Municipality sent to the Plaintiff, he was burdened with a $1,500 fee for their replies.

75

In a sweeping manner, Kirkham and Everson extended their services beyond the immediate need, applying their "ACCEPTANCES" on every conceivable transaction in the Plaintiff's history with the Municipality. When the Plaintiff questioned the mounting charges, Kirkham blamed the Plaintiff, justifying the expenses as necessary corrections of past correspondences with the Municipality.

76

Reflecting on the situation, it became clear that if Kirkham truly possessed the competence he professed, a more logical and ethical approach would have been to settle the outstanding taxes and address further assessments under his proposed legal strategy.

77

However, it was evident that their primary motivation was financial gain rather than the resolution of the Plaintiff's legal matters.

78

Despite suspecting overcharging, the Plaintiff valued the promised outcomes and knowledge at any cost. This faith was exploited; after the property was auctioned, Kirkham and Everson notified the Plaintiff that his funds were depleted and demanded more money to continue his representation. The Plaintiff complied, sending an additional $15,000, only to be

met with further demands for payment.

79

Confronted with this exploitation, the Plaintiff traveled to Torrance, California, for a direct meeting. He reminded them of their initial estimate and his payments exceeding $34,000, against which they presented a supposed outstanding balance of $11,000. After negotiation, they agreed to proceed for $1,000 monthly. The agreement was slightly adjusted in the Plaintiff's favor when he pointed out an unauthorized charge, yet the reduction did not fully account for the overcharge.

80

Following the negotiation, the Plaintiff was persuaded to cover the costs of a lunch that unexpectedly amounted to $230, thanks to an expensive bottle of wine suggested by Billy Everson. The lunch concluded with Everson offering a "holy kiss" and expressions of love, a gesture that, in hindsight, bore no sincerity considering their continuous financial exploitation of the Plaintiff, totaling $50,000 in fees and contributing to a loss of over a million dollars in property—an outcome of their failure to appropriately manage the Hawkins Lane tax matter.

81

They assured the Plaintiff of filing for federal removal to contest the Municipality's actions. This promise was made after the property's tax sale but before the expiration of the redemption period. This assurance prompted the Plaintiff to delay immediate action, fostering false hope.

82

Two months later, Everson reaffirmed his commitment to the case, leading the Plaintiff to continue monthly payments of $1,000 for nine months to avoid giving them any reason to defer the filing of the Federal Removal. Despite growing evidence to the contrary, the Plaintiff maintained hope in their legitimacy, influenced by Kirkham's status as a licensed attorney and their methods aligning superficially with the Plaintiff's beliefs.

## 83

As the redemption period neared its end, the Plaintiff, advised by a friend, sent an additional $2,000 to expedite the removal process.

## 84

For two years, the Plaintiff received no communication from Kirkham or Everson. It was only after persistent attempts that the Plaintiff managed to engage them separately in conversation.

## 85

The Plaintiff reports a dialogue with Billy Everson in which Everson denied agreeing to conduct a Federal Removal—a statement the Plaintiff asserts was false.

## 86

The Plaintiff requested the return of an additional $2,000 sent to Everson earmarked 'for help with the removal.' Everson refused to return this money.

## 87

Subsequent communications with Kirkham, the elderly attorney/doctor, resulted in an apology for Everson's actions. However, Kirkham disavowed responsibility, stating his role was limited to being Everson's attorney, not the Plaintiff's.

## 88

The Plaintiff had been under the impression, bolstered by a licensed attorney's proclamation, that Billy had a "100% success rate" in matters akin to the Plaintiff's—this was the underpinning of their agreement. The Plaintiff would not have entered into the agreement without this testimony.

## 89

Kirkham conceded that "most of the people we work for run out of money." To the Plaintiff, this admission seemed to imply a predatory practice of targeting and exploiting vulnerable individuals until their resources were depleted without providing substantive

assistance.

90

The Plaintiff underscored to Kirkham that prior to engaging with them, desperation was not among the Plaintiff's concerns; moreover, the Plaintiff remained financially afloat and upheld his commitments even in the face of apparent deception by the duo.

91

The Plaintiff's initial confidence in Kirkham and Everson's approach was founded on a reinforced belief in a Unified Commercial Code (UCC) remedy involving the strategic use of negotiable instruments. The Plaintiff's oversight lay in not discerning the unscrupulous nature of the individuals presenting these concepts.

92

Billy Everson had furnished the Plaintiff with a preliminary draft of a motion for federal removal under the guise of the "Trading with the Enemy Act of 1917," asserting that "THE PEOPLE" lack standing in contemporary courts. However, the exhibits for said motion were purportedly misplaced—an oversight that, in hindsight, the Plaintiff views as indicative of Everson's deceit regarding intentions to file the motion.

93

The Plaintiff hired professional assistance to verify the citations in the preliminary motion furnished by Kirkham & Everson but found none of the referenced case law or other authorities.

94

The Plaintiff later learned through informal channels that Everson had developed a 225-page "50 caliber" document, which he is allegedly attempting to market for $20,000. The Plaintiff expresses a desire to review this document, given the lack of understanding of how Everson correlates commercial paper with the Trading with the Enemy Act.

95

Moreover, the Plaintiff has been informed that a "Non Standi" document authored by

Everson & Kirkham has been utilized in four distinct cases within the United States District Court, and this document is purportedly being suppressed because it allegedly contains proprietary knowledge.

96

While the Plaintiff considers the possibility of pursuing formal grievances against the Attorney/doctor's professional credentials due to the egregiousness of the conduct, the practicality of such actions is in question, given Kirkham's advanced age (91) and information suggesting that his license to practice may have already been suspended.

97

The Plaintiff regretfully notes the lack of knowledge regarding the actual status of Kirkham's law license at the time of their engagement. Kirkham had represented himself as an active member of the bar convincingly.

98

The relationship between the Plaintiff and Kirkham & Everson was ultimately terminated in or around the years 2019-2020, concluding a period marked by deception and financial exploitation.

99

The Plaintiff has persistently engaged with the study of commercial paper and the Uniform Commercial Code (UCC). Through this study, he has come to believe that the Municipality has significant legal problems due to its handling of the tax foreclosure on his property.

100

The Plaintiff possesses a more substantial evidentiary trail on the bond presented to the Municipality in his name on the advice of the Hawaiian mentor than on the coupons accepted for value by two lawyers in his name, which were returned to the Municipality. Despite utilizing these methods, which the Plaintiff understands should have discharged the tax bill, neither did.

Furthermore, no explanation has been provided as to why these methods failed.

101

All attempts by the Plaintiff to question the legitimacy of the Municipality's tax claims on his property have been ignored. Following this, the Municipality seized and sold his property, including personal property acquired over three decades, family heirlooms, tools of trade, inventory of trade, ect, retaining all proceeds from the sale. The Plaintiff concludes from this experience that the Municipality does not operate under the rule of law but rather through the exertion of raw political power.

102

The Plaintiff attended what he argues was a sham "Quiet Title Action" by the Alaska court system, initiated by the entities that purchased his property at the tax sale. He attempted to make a special, limited appearance to present a NOTARY PROTEST (CERTIFICATE OF DISHONOR) in court, showing that a bill of exchange had been presented to the Municipality to discharge the taxes. While the court did not formally record this document as the Plaintiff requested, there is evidence that it was presented in open court.

103

Through his research, including reading the COMMERCIAL MANUAL, the Plaintiff firmly believes in the legitimacy of the bond he issued, regardless of the drawee's identity, describing it as a valid negotiable instrument. He contends that the bond's good standing relies not on his credit with the drawee but on the commercial law's requirements for the holder of the bond.

104

Despite the Municipality accepting the bond without making a presentment or issuing a NOTICE OF DISHONOR, law enforcement agents forcibly removed the Plaintiff and his family from their home, taking most of their belongings - possessions acquired over 30 years.

The Plaintiff has extensively documented his transactions, all sealed and distributed widely, ensuring a comprehensive record of his side of the dispute.

106

After ending his legal relationship with Kirkham and Everson, the Plaintiff learned of successful cases in Florida where property taxes were challenged based on statutory distinctions between commercial and residential property taxes.

107

Motivated by these cases, he filed a Freedom of Information Act request against the Municipality, and he intended to pursue litigation on the issue from that angle, but the process was halted by the onset of the Covid-19 pandemic.


## STATEMENT OF FACTS GIVING RISE TO THE CAUSE OF ACTION

108

Approximately thirty years ago, the Plaintiff purchased a property that is referred to by the municipality as Tax Parcel 016-112-10-00012 Freeman Lot 11 in Anchorage Alaska, with a street address of 11500 Hawkins Ln, Anchorage, Alaska.

109

For decades, he lived on and paid taxes on the property known as Tax Parcel 016-112-10-00012 Freeman Lot 11 in Anchorage Alaska.

110

In early 2012, the Plaintiff received a tax notice for 2012 from the Municipality of Anchorage for his property Tax Parcel 016-112-10-00012 Freeman Lot 11.

111

The tax notice indicated that Plaintiff was assessed the following amounts on his property:  $6,676.41,  886.35, 45.00 for a total of 7,607.76.

Plaintiff sought to protest the municipality's assessments and the Municipalities right to collect taxes on this particular property.

113

As a part of this process the Plaintiff did not pay the $7,607.76 in assessed property taxes on the Tax Parcel 016-112-10-00012 Freeman Lot 11 property before the end of 2012.

114

On March 7, 2013, the municipality petitioned the superior court in case number 3AN-13-05671 CI for a judgment and decree of foreclosure on properties that included Tax Parcel 016-112-10-00012 Freeman Lot 11.

115

On May 10, 2013, the municipality was granted a judgment and decree of foreclosure on Tax Parcel 016-112-10-00012 Freeman Lot 11 in case number 3AN-13-05671 CI.

116

On November 10, 2014, the Honorable John Suddock, Judge of the Alaska Superior Court, issued an Order in case number 3AN-13-05671 CI granting a request for a Clerk's Deed on the subject property because the property was not redeemed within the one year period of redemption provided for under Alaska statutes.

117

On November 13, 2014, Cynthia Lee, Clerk of the Trial Courts for the State of Alaska, Third Judicial District, executed a Clerk's Deed in favor of the Municipality of Anchorage.

118

After the Municipality of Anchorage foreclosed on the property and obtained a Clerk's Deed, it issued a quitclaim deed to the Wehr Family Trust DTD 2008 and Larry E. Wehr, et al.

119

The Plaintiff had accrued a tax bill of $ 7,607.76 on the property at the time of the tax

foreclosure; the Municipality sold the property for in excess of $243,235.29.

120

According to the Tax Assessor's office, the property had an assessed market value of over $500,000.

121

At the time of the tax foreclosure, the Plaintiff owned the property free and clear other than the assessment of the taxes.

122

The Municipality retained all of the profits of the sale, which itself was for an amount that was half of its own assessed market value, and returned none of it to the Plaintiff.

123

By foreclosing on the Plaintiff's property for less than eight thousand dollars in tax assessments, the Municipality gained title to a half a million dollar property, and then sold it for less than half the market value and kept the excess from the sale over and above the amount of taxes claimed due and owing.

124

When a local government takes a home at a property tax foreclosure and keeps the homeowner's equity after the tax debt is paid, it implicates the Takings Clause of the Fifth Amendment to the United States Constitution.

125

Here, the property at issue had a market value in excess of $500,000 - without considering the other personal property that was taken by the Municipality which was seized after the sale.

126

Here, the taxes owed on the property were far less than both the market value of the property and the amount the Municipality realized from the foreclosure.

Therefore, the taking of property worth far more than was needed to relieve a tax debt, and retaining the profits implicates theTakings Clause of the Fifth Amendment and was in violation of the Excessive Fines Clause of the Eighth Amendment, and damaged the Plaintiff.

## THEORIES OF RECOVERY

### Build Up to Eighth Amendment Liability

128

The following section is included and was formerly the Plaintiff's theory for recovery under the Fifth Amendment. Because Plaintiff is unsure of what would be fatal to the restatement of his claims per the direction to amend, this section has been retained.

129

The Supreme Court held in *Tyler v. Hennepin* that when a local government takes a home at a property tax foreclosure and keeps the homeowner's equity after the tax debt is paid, it violates the Takings Clause of the Fifth Amendment to the United States Constitution. Given this, and based on the facts alleged herein above, the Municipality of Anchorage has violated the takings clause, and the Plaintiff is entitled to be compensated for the equity in the home that was lost after the tax foreclosure, less the amount of the tax debt which was paid from the proceeds of the sale.

130

The Takings Clause of the Fifth Amendment, which is applicable to the states through the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation."

The Supreme Court has held that just compensation is generally determined as of the date of the taking. *United States v. 564.54 Acres of Land*, 441 U.S. 506, 511 (1979). In a tax foreclosure case, this is the date when absolute title to the property is transferred from the homeowner to the government or private purchaser.

The Court has also held in takings cases that the constitutional requirement is premised on the principle of indemnity, that the amount of compensation is "measured by the property owner's loss rather than the government's gain." *Brown v. Legal Found. of Washington*, 538 U.S. 216, 235–236 (2003). The private party "is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." *Olson v. United States*, 292 U.S. 246, 255 (1934). Thus, the homeowner's remedy should be an award of damages based on the difference between the value of the property and the total tax debt owed to the government.

In condemnation cases involving real property, the US Supreme Court has stated that courts generally have found that the owner is entitled to the "market value" or the "fair market value" of the property, *United States v. Miller*, 317 U.S. 369, 374 (1943), and that the owner has the burden to establish this value. *United States ex rel. TVA v. Powelson*, 319 U.S. 266, 273 (1943).

Plaintiff did not relinquish any interest in the surplus equity in his home due to his failure to pay property taxes. Neither did he relinquish any interest in the surplus equity by failing to return a (superfluous) W-9 sent to him by the Municipality. He is therefore entitled to be justly compensated for the difference in the tax debt owed and the equity he had in the home.

The Municipality here will likely argue that 'just compensation' should be the amount of the surplus proceeds, that is the difference between the total taxes owed and the auction sale price. But this amount is considerably less than compensation measured by the property's fair market value. If made, this argument should be rejected because the US Supreme Court has unambiguously held that a homeowner, like the Plaintiff, is entitled to recovery of compensation based on the equity lost as a result of the taking; therefore, the surplus proceeds from the municipality's sale of the property are not in and of themselves a complete representation of the Plaintiff's surplus equity in the home after the payment of taxes.

141

For these and other reasons stated herein above or below and/or otherwise supported by the facts sufficiently alleged, the Plaintiff is entitled to damages in amount to be determined at trial, to include actual, consequential, and compensatory as allowed by law, but in no case less than the amount of equity the Plaintiff lost as a result of the foreclosure sale, less the amount of the taxes otherwise due. At the very least, "[t]o withhold the surplus from the owner would be to violate the Fifth Amendment to the Constitution and to deprive him of his property without due process of law, or to take his property for public use without just compensation."

142

This has been restated in this Amended Complaint as a foundation to what follows.

## EIGHTH AMENDMENT EXCESSIVE FINES AND FEES - CRUEL AND UNUSUAL PUNISHMENT

143

Plaintiff argues that his loss of the surplus equity in the tax foreclosure proceeding was a monetary sanction that violated the Eighth Amendment Excessive Fines Clause, which is an incorporated protection applicable to the states under the Fourteenth Amendment Due Process

Clause.

144

Here, the Alaskan statutory foreclosure scheme as executed by the Municipality of Anchorage is punitive because it serves a goal of punishment, that being deterrence, in that the tax-forfeiture scheme provides the ultimate possibility of loss of property and serves as a deterrent to those taxpayers considering tax delinquency.

145

As such, and as here, because the statutory scheme imposes a monetary penalty in order to deter willful noncompliance with the law, it is a fine, because economic penalties imposed to deter willful noncompliance with the law are fines by any other name. And the Constitution has something to say about them: They cannot be excessive.

146

Here, the Municipality foreclosed on a half-million dollar plus home and deprived the Plaintiff of its use and his property interest for a tax assessment of less than $8,000. It sold the home at less than half of its market value and then proceeded to keep the surplusage.

147

This was an excessive fine and/or fee under the Eighth amendment and is a cruel and unusual punishment to the extent that it acts as a deterrence against tax protestors or others engaging in a good faith dispute with the assessments.

148

Furthermore, tax forfeitures such as the one here actually operate to remove the tax protestor from ownership and replace him or her with someone that has a mortgage. Property that is burdened by a mortgage results in property tax assessments being paid to the local government by the mortgage holder. By pursuing a policy that favors removing fee simple, mortgage free real estate owners in favor of mortgage holders, the Municipality can stabilize the tax receipts realized by its property assessments.

Mortgage companies pay the property tax regularly and on time for each parcel that they hold the mortgage on, and they do not question any increase in the assessment amounts.

Property owners that hold their fee simple property free and clear of a mortgage can question the validity and accuracy of tax assessments. These people can, and often will, withhold tax payments in an attempt to gain resolution to their issues with governing authority.

It is in the Municipalities fiscal interest to replace complaining, late paying, authority challenging property owners that hold free and clear of a mortgage with someone that has a mortgage on the property because it effectively makes the mortgage holder the taxpayer, and reduces the opportunity to, and the effective vectors for, challenge to its fiscal policies

For these and other reasons stated herein above or below and/or otherwise supported by the facts sufficiently alleged, the Plaintiff is entitled to damages in amount to be determined at trial, to include actual, consequential, and compensatory as allowed by law, but in no case less than the amount of equity the Plaintiff lost as a result of the foreclosure sale, less the amount of the taxes otherwise due. At the very least, to withhold the surplus from the owner violates the excessive fines and fees clause of the Eighth Amendment to the Constitution and constitutes cruel and unusual punishment.

Also, as to the excessive fines claim, Plaintiff argues that the statutory regime which authorized Anchorage to retain the surplus, serves to impose a fine within the meaning of the Eighth Amendment's Excessive Fines Clause.

Furthermore the Plaintiff directly incorporates the arguments and assertions contained in the 'Summary of Exhibits to Plaintiff's First Amended Complaint as if set out verbatim here to the extent that it, inter alia, provides evidence sufficient to support a finding of an unlawful scheme or practice designed to unlawfully obfuscate the money trail and cover up its actions.

155

The regime is at least partially punitive because it goes beyond compensation and also serves to deter future tax delinquency. Indeed, the regime is analogous to civil forfeiture schemes that Courts have previously characterized as punitive, and it fits within the Court's general understanding of punishment in the securities context.

## FOURTEENTH AMENDMENT VIOLATION OF DUE PROCESS

156

With regard to the due process claims, both procedural and substantive, Plaintiff contends that while the state law has a post-foreclosure process to recover surplus equity,and although the Municipality claims to have followed it and the documentation appears proper, the fact that there is substantial evidence to indicate that the mechanisms offered to the Plaintiff were mere gloss and nothing more than a sham.

157

They did not send the money to the unclaimed property division, as evidenced by the Exhibits attached to this First Amended Complaint - Exhibit 13, specifically.

158

Furthermore, they did not send the letter to the Plaintiff telling him to confirm his address to have the funds released until the time in the letter to respond had expired.

159

Here, the government seized the Plaintiff's property to satisfy a delinquent tax debt, and

it has used the tax debt as a toehold to confiscate more property than it is owed; then it created a manufactured appearance of the Plaintiff in noncompliance to justify its taking.

160

While a government may seize and sell a homeowner's property to satisfy delinquent tax debts, it cannot use the tax debt as a toehold to confiscate more property than it is owed and retain surplus funds from the foreclosure sale used to satisfy the debts. This is because homeowners have a property interest in the equity of their homes.

161

Here, the Plaintiff had over half a million dollars equity in his home. The government seized it for less than eight thousand dollars in taxes. To date it has neither given the Plaintiff the amount of surplus from the sale nor has it compensated the Plaintiff for the fair market value of his home over and above the amount of the surplus from the sale it conducted for which it deducted its tax debt. In fact, it has actually engaged in the type of fraud that would have an individual locked up and a company shut down if caught engaging in similar fraud.

162

The Municipality of Anchorage has been unjustly enriched as a result thereof, and such unjust enrichment is a violation of Plaintiff's due process rights.

**CONCLUSION**

163

As such, the Plaintiff asserts a federal excessive fines and fees claim against the Municipality of Anchorage; because of this claim, the Plaintiff is entitled to relief from the Defendant.                                    164

To the extent that this claim is brought outside the normal limitations period, the Defendant should be equitably estopped from relying on that condition to evade liability on the instant facts.

165

To the extent that the Defendant is not equitably estopped from relying on a limitations defense, there exists extraordinary circumstances which include ineffective assistance of counsel as well as other events beyond the Plaintiff's control, which would authorize the limitations period to be equitably tolled.

166

Finally, when a fact pattern supports both the maxim "The law will not shield the government that persists in its injustice" on the one hand, and the maxim "The law will not protect a man insistent in his folly" on the other, priority should be given to "The law will not shield the government that persists in its injustice."

167

Such an approach will serve to maintain balance within society, secure democratic governance, promote faith in institutions, prevent abuses of power, and ensure overall societal progress than the alternative.

## PRAYER FOR RELIEF

The relief which the Plaintiff prays for is that he be made whole; specifically:

1.     The Municipality of Anchorage should be ordered to pay the Plaintiff actual and compensatory damages in an amount not less than the fair market value of the home it took and the value of the contents therein and buildings thereon, with interest, less the amount of taxes it claims were due - irrespective of the amount of the surplus realized by the Municipality on the actual sale; or in the alternative,

2.     The Municipality of Anchorage should at least be ordered to pay over to the Plaintiff the surplusage received over and above the amount of the taxes realized by its sale of the property in question along with interest,

3.     The Municipality of Anchorage should be ordered to pay the expenses of this action.

4.     Whatever other such relief as the Court may deem necessary and proper, up to and including punitive damages should the evidence indicate that the Municipality may be subjected to the same under the Note 29 Exception.

5.     Plaintiff also requests a jury trial on all issues, matters, and questions of fact as allowed by law.

Respectfully submitted, this _____6th_____ day of ___May___, 2024

DAVID PAUL BIESEMEYER, Pro Se
Plaintiff above named

7650 E. Jim Cottrell
Palmer, AK 99645
907 982 2328
davebiesemeyer@hotmail.com

## VERIFICATION

COMES NOW the undersigned who declares under penalty of perjury that the foregoing as well as all exhibits and attachments thereto are true and correct to the best of the affiant's knowledge, information, and belief.

State of Hawaii )
               ) SS.
County of Hawaii )

DAVID PAUL BIESEMEYER, Pro Se
Plaintiff above named

Sworn to and Subscribed Before
Me this 6th Day of May, 2024

Notary Public

NOTARY CERTIFICATION

Date May 6, 2024    Third Circuit

Notary Name Desiree Clifford

Commission Expiration Date 6 20 25

Notary Signature

NOTARY PUBLIC
Comm. No.
05-371
STATE OF HAWAII
DESIREE CLIFFORD



David Paul Biesemeyer
7650 E Jim Cottrell Circle
Palmer, Alaska 99645

CERTIFIED MAIL

9589 0710 5270

*Retail*

U.S. POSTAGE PAID
PM
CAPTAIN COOK, HI 96704
MAY 06, 2024

$27.50

RDC 03

#5 10.5 x 16 IN.
BBLE MAILER

U.S. District Court
222 W. 7th Avenue,
Room 229, Box/Suite #4
Anchorage, AK 99513

PRIORITY MAIL
TRACKED INSURED
UNITED STATES POSTAL SERVICE
For Domestic Use Only

UNITED STATES POSTAL SERVICE.

USPS
OFFICIALLY LICENSED PRODUCT